NUMBER 13-04-202-CV

 

                         COURT OF APPEALS

 

                     THIRTEENTH
DISTRICT OF TEXAS

 

                         CORPUS
CHRISTI - EDINBURG 

 

             IN
THE INTEREST OF J.J., J.S., J.E., AND C.E., CHILDREN

 

       On
appeal from the 24th District Court of Victoria County, Texas.

 

             CONCURRING AND DISSENTING
MEMORANDUM                                                 
OPINION

 

         Before
Chief Justice Valdez and Justices Hinojosa and Yañez 

    Concurring
and Dissenting Memorandum Opinion by Justice Yañez                 

 

I concur in part and dissent in part.  I agree with the majority=s decision to affirm the court=s order terminating appellant, Jerry Edward=s parental rights. 
However, I respectfully dissent from the majority=s decision affirming termination of appellant,
Cheryl Edward=s parental rights. 
Accordingly, I would remand this case for a new trial to determine
Cheryl=s parental rights.








            Further, I write separately because I
believe a more thorough recitation and review of the facts and analysis are
necessary in this termination proceeding. 
Parental rights are of constitutional dimension and termination is the
most drastic remedy because of its final and irrevocable nature.[1]  Consequently, it is our duty as an appellate
court to adequately recite the relevant facts and fully address the issues
raised on appeal. 

Facts

The majority=s factual recitation emphasizes factors that reflect
negatively on the parents, while omitting most facts favorable to the
parents.  Because I believe a recitation
of all relevant facts are essential to this proceeding, I will address the
majority=s omissions, and provide a comprehensive factual
recitation and detailed analysis. 

With regard to Jerry, the majority notes Jerry=s status as a sex offender, but omits facts relevant
to how his status relates to the termination proceeding.  








At trial, Regina Williamson, a former TDPRS
caseworker, testified that she was assigned to the Edwards= case and that Jerry told her he was on probation
because of his sex offender status. 
Williamson, however,  acknowledged
that Jerry informed her that the terms of his probation did not prohibit him
from being around his children. 
Williamson testified she told Jerry she did not know if TDPRS=s policy prohibited such contact.  She admitted that she could not remember
whether she inquired regarding whether Jerry=s
status prohibited him from being around his children.  Jerry testified that he had attended
counseling for sex offenders, which he claimed allowed him to be around his
children.  Cheryl also testified that she
was unaware of his status as a sex offender when they first met, had been
married to him for six years and was married to him at the time of trial, and
that Jerry had never harmed any of the children.  

Cheryl=s decision to allow the children to be around Jerry
was a strongly disputed  issue at
trial.  The majority=s notation of his status, without mentioning that it
was unclear whether the terms of his probation precluded him from associating
with his children, militates only in favor of TDPRS.  Without a full recitation of the relevant
facts, the majority presents a severely circumscribed portrayal of this issue. 

With regard to Cheryl, the majority notes that
Cheryl (1) ignored TDPRS=s recommendations and (2) had used drugs since the
age of sixteen.  However, the majority
failed to mention several undisputed facts pertinent to these two issues.

The majority notes that TDPRS recommended that
Cheryl enter drug rehabilitation. However, it does not mention Cheryl=s testimony that she attempted to check herself into
a rehabilitation program, but was informed by program representatives that
their facility did not treat marihuana users. 
Without recitation of Cheryl=s testimony, a misguided perspective is created that
Cheryl made little or no effort to comply with TDPRS=s recommendation regarding rehabilitation.   

In light of these omissions, a comprehensive
recitation of the facts, and detailed analysis are set forth below.  








This termination proceeding arose because of an
incident that occurred on November 1, 2002. 
Early that evening, Cheryl decided to go out with a friend to a local
bar.  A few hours after Cheryl left her
home, one of the children fell from a living-room sofa and bloodied his
nose.  At the time of the accident, the
children were apparently left unattended. 
Immediately after the accident, the two oldest children, J.J. (age
10)  and J.S. (age 8), requested
assistance from a neighbor who lived nearby. 
The neighbor was unable to reach Cheryl by telephone, and as a result,
called the police.  A few hours after the
police arrived, Cheryl arrived home at approximately 3:00 a.m.  Days later after an investigation, TDPRS
filed its original petition and request for temporary orders to permanently
remove the children from her custody. 

On February 17, 2004, the termination action
proceeded to a bench trial, where the trial court heard testimony from several
witnesses.  The first witness, Randall
Branecky, a Victoria County police officer, testified that he responded to the
neighbor=s call for assistance on the night in question.  Branecky testified that Cheryl arrived home
early the next morning and that he questioned her regarding why the children
were left unattended.  According to
Branecky, Cheryl claimed she was at a friend=s
house and that she had left the children with babysitters, although Branecky
was unable to corroborate her claim. 
Branecky testified that because of the November 1, 2002 incident, Cheryl
was subsequently indicted and convicted for child endangerment.              

Sara Perry, a former TDPRS caseworker, testified
that she was on-call for TDPRS on the evening of November 1, 2002.  According to Perry, she arrived at Cheryl=s apartment shortly after police arrived.  Perry claimed that Cheryl arrived home around
3:00 a.m. the next morning.  At that
time, Cheryl told Perry that she had left the children with paid babysitters
and did not know why the babysitters left early.  Perry further testified that when Cheryl
arrived home, she did not appear to be under the influence of any intoxicant
and that she did not know whether Cheryl was under the influence of drugs or
alcohol when she returned home. 








Regina Williamson, a former TDPRS caseworker,
testified that she was assigned to Cheryl=s case a few days after the children=s removal, but was not present at the time of their
removal.  According to Williamson, prior
to the children=s removal, Cheryl had been investigated numerous
times since 1994 for child abuse resulting in one conviction for injury to a
child.  As a result of past
investigations, Williamson testified that TDPRS recommended that Cheryl attend
counseling.  Despite TDPRS=s recommendation, Williamson testified that Cheryl
had not attended counseling on a regular basis. 


Williamson also contacted Jerry, a convicted sex
offender,[2]
who is the father of J.E. and C.E.,  to
inform him that the children were in foster care.  Jerry told Williamson that he wanted to see
the children and that his probation officer said it was A. . . all right for him to be around children.@  Williamson
testified she told Jerry A. . . [she] wasn=t sure
what policy was and that [she] [would] . . . check that out.@  After her
conversation with Jerry, she discovered that Jerry was once again
incarcerated.  At trial, Williamson could
not remember whether she inquired regarding sex-offender policy and did not
know whether Jerry was prohibited from being around the children. 








Cheryl, who was thirty-two years old at the time of
trial, testified that she had been incarcerated for fifteen months and that she
would be released sometime between November 2004 and February 2005.  Cheryl testified that on November 1, 2002,
she had gone out with a friend and, despite her probation,[3]
had consumed a couple of drinks.  Cheryl
claimed that she left the children with babysitters and that she had arranged
for the sitters to spend the night.  She
further stated that she left three dollars in quarters for emergency phone
calls and that a pay phone was located approximately fifty feet from her
home.  Cheryl also stated that she was
unaware that the babysitters left early and that she had no intent to abandon
her children or do anything that would harm them.  

Regarding her relationship with Jerry, Cheryl
testified that they had been married for six years and that they correspond
regularly.  Prior to their marriage,
Cheryl claimed she was unaware that he was a sex offender.  Cheryl testified that she did not believe
Jerry=s sex-offender status would affect his relationship
with the children, that Jerry had never harmed the children, and that he Atried very hard@ to be a good father.  Cheryl also claimed that in the past, she had
one or two physical fights with Jerry. 
On one particular occasion, Cheryl became involved in a physical
altercation with Jerry and instructed J.J. to call 911.  Cheryl claimed the children were not
physically harmed.  As a result of the
incident, Jerry was convicted for assault. 
Additionally, Cheryl admitted that Jerry had never provided consistent
support for the children because he had been incarcerated during most of their
marriage. 








Regarding her past behavior, Cheryl testified that
she had a difficult upbringing, admitted that she had anger problems,
acknowledged that she had made past mistakes regarding discipline of her
children, and admitted to calling them names and swearing in their presence.  Cheryl admitted that she often left the
children in her mother=s care because of her desire to attend drug
rehabilitation; however, she admitted that she never attended.  Cheryl also testified that in 1997, she
tested positive for marijuana and methamphetamine, and that marijuana had
occasionally been a problem for her in the past.  According to Cheryl, she had smoked marijuana
periodically since the age of sixteen.

Despite her incarceration, Cheryl maintained that
she wanted custody of her children. 
Cheryl stated the following: AI=ve completed anger management classes.  I=veBI=ve completed twelve-step classes in which I have . .
. certificates for that.  I=ve completed a leadership . . . class which teaches
you how to better your . . . relationship[s] with your family and your
children.  I=m on the list to be in the parenting class . . . I=m currently in a cognitive intervention class and I=m on the list for a changes class.@  Cheryl also
claimed she regretted her past decisions, and stated that during her
incarceration, she had attempted to improve herself.  Cheryl testified that upon her release, she
would have a guaranteed full-time job, will remain sober, and wanted to start
helping the children Aheal.@              

Jerry Edwards testified that at the time of the
children=s removal, he was incarcerated and was not living
with Cheryl.  According to Jerry, when he
first met Cheryl, he informed her that he was a convicted sex offender.  Jerry also testified that he had two other
children that he had not seen since they were infants.  Jerry claimed that when he was not
incarcerated, he occasionally provided money to Cheryl for child support.  Jerry also maintained that he never witnessed
Cheryl abuse or mistreat any of the children. 
Jerry further testified that his drug of choice was methamphetamine,
that he had never used drugs around the children, and that he was not an
addict.  Jerry also stated that he had
attended counseling for sex offenders, which allegedly permitted him to be
around children. 

Cheryl=s Parental Rights  









 Although
Cheryl's appellate counsel, Keith Weiser, filed an Anders[4]
brief on her behalf, the majority fails to mention that in Weiser=s brief, he contends that a meritorious ground to
consider is whether the evidence is legally and factually sufficient to support
termination of Cheryl's parental rights. 
In support of this contention, counsel provides a comprehensive argument
explaining why the evidence is legally and factually insufficient to support
the court=s order terminating Cheryl=s parental rights.  
                                                 When
a state initiates a parental rights termination proceeding, it seeks not merely
to infringe that fundamental liberty interest, but to end it.[5]  The right of a parent to maintain custody of
and raise his or her child "is an interest far more precious than any
property right."[6]  The Texas Supreme Court recognizes that a
parent's interest in maintaining custody of and raising his or her child is
paramount.[7]


Sufficiency of the Evidence

Appellant argues that the evidence is insufficient
to support termination of Cheryl=s parental rights. 
In accordance with Anders,[8]
after conducting an independent examination of the record, I conclude that the
legal and factual sufficiency of the evidence are meritorious grounds to
consider on appeal.  I will therefore
consider whether the evidence is legally and factually sufficient to support
the trial court=s order of termination.








The legal sufficiency of the evidence to support the
trial court=s order of termination under section 161.001 of the
Texas Family Code must first be addressed.[9]

In reviewing a legal sufficiency claim, a court
should look at all the evidence in the 
light most favorable to the finding to determine whether a reasonable
trier of fact could have formed a firm belief or conviction that its finding
was true.[10]  To give appropriate deference to the
factfinder=s conclusions and the role of a court conducting a
legal sufficiency review, a reviewing court must assume that the factfinder
resolved disputed facts in favor of its finding if a reasonable factfinder
could do so.[11]  A corollary to this requirement is that a
court should disregard all evidence that a reasonable factfinder could have
disbelieved or found to have been incredible.[12]  This does not mean that a court must
disregard all evidence that does not support the finding.[13]  Disregarding undisputed facts that do not
support the finding could skew the analysis of whether there is clear and
convincing evidence.[14]  








If, after conducting its legal sufficiency review of
the evidence, a court determines that no reasonable factfinder could form a
belief or conviction that the matter that must be proven is true, then that
court must conclude that the evidence is legally insufficient.[15]  Rendition of judgment in favor of the parent
would generally be required if there is legally insufficient evidence.[16]


A trial court can terminate parental rights only if
it finds that (1) a parent has committed a predicate act or omission harmful to
the child, and (2) termination is in the best interest of the child.[17]  The court must ensure that these findings are
made by clear and convincing evidenceBa standard of proof specifically intended, in view
of the constitutional interests at stake, to reduce the risk of erroneous
terminations.[18]  While proof of the predicate act or omission
does not relieve appellees from proving the best interest of the child, the
same evidence may be probative of both issues.[19]   

The record in this case shows that the trial court
relied on sections 161.001(1)(D)[20]
and 161.001(1)(E)[21]  in support of its termination order.  The court=s
order, which tracks the statutory language of sections (D) and (E), reflects
that the trial court found by clear and convincing evidence that Cheryl:

5. . . . knowingly placed or knowingly allowed the
children to remain in conditions or surroundings which endangered the physical
and emotional well-being of the children in that CHERYL EDWARDS failed to
provide adequate supervision of the children on several occasions, permitted a
registered sex offender to reside in her home with the children, and engaged in
physical and emotional abuse of the children. 
These acts resulted in physical and emotional harm to the children.  

 








6. . . . engaged in conduct or knowingly placed the
children with persons who engaged in conduct which endangered the physical and
emotional well being of the children in that CHERYL EDWARDS failed to provide
adequate supervision of the children on several occasions, permitted a
registered sex offender to reside in her home with the children, and engaged in
physical and emotional abuse of the children. 
These acts resulted in physical and emotional harm to the children.  

 

The court also found Aby
clear and convincing evidence@ that termination of the parent-child relationship
between Cheryl and her four children Ais in the best interests of the children.@[22] 

I will first address the legal sufficiency of the
evidence that supports the court=s findings that Cheryl (1) knowingly placed or
knowingly allowed the children to remain in conditions or surroundings which
endangered their physical and emotional well-being, and (2) engaged in conduct
or knowingly placed the children with persons who engaged in conduct that
endangered the physical and emotional well-being of the children.[23]        

In support of the court=s order of termination, the record reflects that
Cheryl (1) consumed alcohol on November 1, 2002, in violation of her probation,
(2) had previously been placed on probation for injury to a child, (3) had not
attended counseling despite TDPRS=s recommendation, and (4) as a result of the
November 1, 2002 incident, was convicted for child endangerment. 








Jerry also testified to the following: (1) he used
methamphetamine; (2) he was convicted of indecency with a child; (3) he
previously failed to register as a sex offender; (4) when he first met Cheryl,
he informed her of his status as a sex-offender; (5)  Cheryl called J.J. a Afaggot@ and Abastard@ and she A[would] go off on anybody;@ (6) Cheryl used methamphetamine on at least two
occasions; and (7) he witnessed her smoke marijuana while the children were in
the upstairs area of her apartment.

Regina Williamson also testified that Cheryl had
been investigated ten to fifteen times by TDPRS.  Williamson testified that past TDPRS
investigations resulted in at least three findings of Areason to believe@[24] physical abuse of the children.  She also testified that J.J. had previously
told her that Cheryl had left the children at home unattended on more than one
occasion.  Williamson further claimed
that Jerry had also been previously investigated for physical abuse of the
children which resulted in a finding of Areason to believe.@  

Cheryl also testified that in the past, she left the
children with others, used drugs, and verbally abused the children. 

The undisputed evidence that does not support the
trial court=s finding that Cheryl endangered the children under
section 161.001(1) must also be considered.[25]  

Sara Perry testified that on November 1, 2002,
Cheryl did not appear to be under the influence of any intoxicants.  Jerry also testified that during the November
1st incident, he was incarcerated and was not living with Cheryl.  The record also reflects that Cheryl had been
investigated by TDPRS on at least five different occasions for neglect, as well
as physical and emotional abuse of the children.  In all of these investigations, however,
TDPRS was unable to substantiate the allegations.  








Viewing this evidence in the light most favorable to
the court=s findings and recognizing that the court in this
case was the sole arbiter in assessing the credibility and demeanor of the
witnesses, I conclude that a reasonable factfinder could form a belief or
conviction that Cheryl (1) knowingly placed or knowingly allowed the children
to remain in conditions or surroundings which endangered their physical and
emotional well-being, and (2) engaged in conduct or knowingly placed the
children with persons who engaged in conduct that endangered their physical and
emotional well-being.[26]  Thus, the evidence is legally sufficient to
support the court=s findings under section 161.001(1).[27]

Next, I must evaluate the legal sufficiency of the
evidence under the second prong of section 161.001, which requires that
termination be in the best interests of the children.[28]  In J.F.C.,[29]
the Texas Supreme Court listed several non-exclusive factors to consider when
determining the best interest of a child:

(1) the desires of the child;

 

(2) the emotional and physical needs of the child
now and in the future;

 

(3) the emotional and physical danger to the child
now and in the future;

 

(4) the parental abilities of the individuals
seeking custody;

 

(5) the programs available to assist these
individuals to promote the best interest of the child;

 

(6) the plans for the child by these individuals or
by the agency seeking custody;

 

(7) the stability of the home or proposed placement;

 








(8) the acts or omissions of the parent which may
indicate that the existing parent-child relationship is not a proper one; and

 

(9) any
excuse for the acts or omissions of the parent.[30] 

In reviewing the legal sufficiency of the trial
court=s findings regarding the children=s best interests, all the evidence previously listed
in support of the finding that Cheryl endangered the children in the manner
described by sections 161.001(1)(D) and (E) must be considered.[31]  

The following undisputed evidence must also be taken
into account in reviewing the court=s finding that termination was in the children=s best interests: (1) an evaluation submitted by
CASA, which reflects that the children have been progressing favorably since
their placement in foster care; (2) CASA=s recommendation that parental rights to all of the
children be terminated; (3) Cheryl=s testimony that she often struggled financially;
(4) Cheryl=s acknowledgment that Jerry never provided consistent
financial support for the children; (5) Cheryl=s
testimony that upon her release from jail, she would remain sober and had a
guaranteed full-time job; (6) Cheryl=s testimony that she successfully completed anger
management, leadership, and cognitive intervention classes; (7) evidence that
showed that with the exception of J.E. and C.E., all of the children reside in
separate foster centers; and (8) testimony that J.S. expressed sadness
regarding his inability to see Cheryl and that he wanted to live with his
mother.  








When considering all the evidence in the light most
favorable to the verdict, a factfinder could reasonably form a firm belief or
conviction that termination of Cheryl=s parental rights is in the best interests of the
children.[32]  I therefore conclude that the evidence is
legally sufficient to support the court=s finding under section 161.001(2).

Because I have concluded that the evidence is
legally sufficient to support the court=s findings under sections 161.001(1)(D) and (E), and
161.001(2), I would overrule Cheryl=s legal sufficiency challenge.

I next address whether the evidence is factually
sufficient to support the court=s  order of
termination under sections 161.001(1)(D) and (E).[33]  








In reviewing a factual sufficiency challenge in a
termination case, an appellate court must give due consideration to evidence
that the factfinder could reasonably have found to be clear and convincing.[34]  The standard focuses on whether a reasonable
jury could form a firm conviction or belief as to the truth of the allegations,
thereby retaining the deference an appellate court must have for the factfinder=s role.[35]  Appellate courts consider whether disputed
evidence is such that a reasonable factfinder could not have resolved that
disputed evidence in favor of its finding.[36]  If, in light of the entire record, the
disputed evidence that a reasonable factfinder could not have credited in favor
of the finding is so significant that a factfinder could not reasonably have
formed a firm belief or conviction, then a challenge to the sufficiency of the
evidence must be sustained.[37]


After reviewing the entire record, while giving due
consideration to the evidence discussed in the preceding paragraphs, I conclude
that a factfinder could reasonably have formed a firm belief or conviction as
to the truth of the allegations under sections 161.001(1)(D) and (E).[38]  I would therefore hold the evidence is
factually sufficient to support the trial court=s
findings under sections 161.001(1)(D) and (E).[39]


Finally, I address whether the evidence is factually
sufficient to support the trial court=s finding that termination is in the best interests
of the children.[40]   








After reviewing the disputed evidence in light of
the non-exclusive factors set forth by the Texas Supreme Court in J.F.C.,[41]
I am unable to say that a factfinder could reasonably form a firm belief or
conviction that termination of Cheryl=s parental rights is in the children=s best interests. 


Regarding the first, second, and third factors
listed in J.F.C.,[42]
although TDPRS presented testimony at trial that the children were progressing
favorably in foster care, the record reflects that TDPRS presented testimony
regarding the stated desires of one child which supports that termination is
not in the best interests of the children. 
Specifically, J.S. expressed his desire to live with his mother and
testified that he was saddened because he was separated from her.  Additionally, at least one of the children
had written to Cheryl during her incarceration. 
In light of the evidence presented as to the first, second, and third
factors, the record does not favor a finding that termination is in the
children=s best interests. 








With respect to the fourth factor,[43]
TDPRS sought termination of Cheryl=s parental rights partly because of her alleged
unsatisfactory parental abilities.  TDPRS
presented evidence that the children had generally improved emotionally since
their placement with foster parents. 
However, TDPRS failed to present specific evidence at trial related to
the parental abilities of the foster parents. 
In contrast, Cheryl presented evidence that showed that she had worked
to improve her parental abilities by attending several life-skills classes and
that she had a guaranteed full-time job upon her release from jail.  The probative value of the disputed evidence
presented by both sides regarding the fourth factor weighs against a finding
that termination is in the children=s best interests.

In regard to the fifth factor,[44]
TDPRS presented testimony that the children had progressed mentally and emotionally
while in foster care.  TDPRS, however,
did not present any evidence as to the programs available to assist with
promoting the children=s best interests while in foster care.  In contrast, the record reflects that Cheryl
was enrolled in several programs to assist her in promoting the children=s best interests. 
Specifically, at the time of trial, she was enrolled in life-skills
courses for the sole purpose of improving herself as a parent, and was also on
the waiting list for other parenting classes. 
The evidence as to the fifth factor therefore militates in favor of a
finding that termination is not in the best interests of the children.








Regarding the sixth and seventh factors,[45]
Cheryl testified that she would have a full-time job upon her release from
jail, which she claimed would enable her to provide support to the
children.  In contrast, TDPRS presented
testimony to support its argument that the children should remain in foster
care.  However, none of this testimony
addressed future plans for the children or discussed the stability of the
proposed placement for any of them. 
TDPRS offered evidence as to whether, once Cheryl=s rights were terminated, it would attempt to place
all the children together.  Given the
placement of the children at several locations, it appears unlikely that TDPRS
would be able to reunite the siblings at a single home.  There was no testimony regarding the
opportunity for adoption of the children. 
As TDPRS offered no evidence regarding its plan for permanent placement
of the children, it is as likely as not that the children will remain in
long-term foster care or even be permanently separated if Cheryl=s rights are terminated.  This likelihood weighs strongly against a
finding that termination is in the children=s best
interests. 

Finally, as to the eighth and ninth factors,[46]  TDPRS presented testimony at trial in support
of its argument that Cheryl failed to provide adequate supervision during the
incident.  Specifically, Officer Branecky
and Sara Perry claimed that on the night of November 1, 2002, Cheryl had left
her children unattended.  As
justification for her acts that night, Cheryl claimed that she paid babysitters
to care for the children, and that it was only upon her arrival home that she
learned that the children were left unattended. 
She also testified that she was sorry for her irresponsible actions both
in the past and on the night in question. 
Cheryl claimed that when she is released from jail, she will remain
sober.  She also expressed a strong
desire to retain custody of all of the children.   








In consideration of the constitutional interests at
stake and in light of the non-exclusive factors set forth in J.F.C.,[47]
the record establishes that as to each factor, the disputed evidence is so
significant that a reasonable factfinder could not have formed a firm belief or
conviction that termination of Cheryl=s parental rights was in the best interests of the
children.[48]
 I therefore conclude that the evidence
is factually insufficient to support the trial court=s order terminating Cheryl=s parental rights.[49]  Accordingly, I would sustain Cheryl=s factual sufficiency challenge.

Conclusion

Having fully stated and considered the issues
presented on appeal, I respectfully concur in part and dissent in part with the
majority.  I concur with the majority=s decision to affirm the court=s order terminating Jerry=s parental rights. 
However, because the evidence is factually insufficient to support
termination of Cheryl=s parental rights, I would reverse the court=s order terminating her parental rights and remand
the cause for a new trial to determine Cheryl=s
parental rights.

 

                                                           
                                                       

      LINDA
REYNA YAÑEZ,

       Justice

 

 

 

 

Concurring
and dissenting memorandum opinion 

delivered
and filed this the 13th day of April, 2006.

 

 

 











[1]  See In re A.M.C., 2 S.W.3d 707, 710 (Tex. App.BWaco 1999, no pet.).





[2]  Jerry acknowledged that he was convicted for indecency with a
child.  According to Jerry, one day he
was sitting inside his home, near a front window.  During that time, two women and a child were
walking on a sidewalk past his home. 
According to Jerry, shortly thereafter, the women wrongfully accused him
of Amasturbating in the window.@ 






[3]  At the time of the November 1, 2002 incident, Cheryl was on deferred
adjudication probation for injury to a child.  
According to Cheryl, the injury to a child charge arose in February
2002, because J.J. refused to walk up the apartment stairs.  Consequently, Cheryl admitted that she
grabbed J.J. by his shirt and Abooted him with [her] foot . . . and told him to get on up@ the stairs.  As a result, Cheryl was charged with injury
to a child and was subsequently placed on deferred adjudication probation. 





[4] 
386 U.S. 738, 738 (1967).





[5]  See In the Interest of J.F.C., 96 S.W.3d 256, 273 (Tex. 2002).  





[6]  See In re M.S., 115 S.W.3d 534, 547 (Tex. 2003) (citing Santosky v. Kramer,
455 U.S. 745, 758-59 (1982)).  





[7] 
See id.  





[8]  386 U.S. 738, 738 (1967).





[9] 
See Tex. Fam. Code Ann. _ 161.001 (Vernon 2002).





[10] 
In the Interest of J.F.C., 96 S.W.3d at 265-66.





[11]  See id. at
266.





[12]
 See id.





[13]
 See id.





[14] 
See id.  





[15]
 See id.





[16]  See id.





[17]  See Tex. Fam. Code Ann. _ 161.001 (Vernon 2002).  





[18]
 In re B.L.D., 113 S.W.3d 340, 353 (Tex. 2003). 





[19] 
In re C.H., 89 S.W.3d 17, 28 (Tex. 2002).  





[20]  See Tex. Fam. Code Ann. _ 161.001(1)(D) (Vernon 2002).





[21]  See id. _ 161.001(1)(E).





[22]  See id. _ 161.001(2).





[23]  See id. _ 161.001(1)(D), (E).  





[24] 
According to Williamson, Areason to believe@ is a term used by TDPRS when investigations Avalidate that . . . abuse happened.@





[25] 
See Tex. Fam. Code Ann. _ 161.001(1)(D), (E) (Vernon 2002); In the
Interest of J.F.C., 96 S.W.3d at 266. 






[26]
 See Tex. Fam. Code Ann. _ 161.001(1)(D), (E) (Vernon 2002).





[27] 
See id. 





[28] 
See id. _ 161.001(2). 





[29]
 In the Interest of J.F.C., 96 S.W.3d at 261-62.





[30]  See id.





[31]  See Tex. Fam. Code Ann. _ 161.001(1)(D), (E) (Vernon 2002); In the
Interest of J.F.C., 96 S.W.3d at 266.





[32]
 See Tex. Fam. Code Ann. _ 161.001(2); In the Interest of J.F.C., 96
S.W.3d at 266. 





[33]  See Tex. Fam. Code Ann. _ 161.001(1)(D), (E) (Vernon 2002).





[34]
 In the Interest of J.F.C., 96 S.W.3d at 266 (citing In re
C.H., 89 S.W.3d at 25).    





[35]  In re C.H., 89 S.W.3d at 26. 





[36]  In the Interest of J.F.C., 96 S.W.3d at 266.





[37]  See id. 





[38]  See Tex. Fam. Code Ann. _ 161.001(1)(D), (E) (Vernon 2002); In the Interest of J.F.C., 96 S.W.3d at 266.





[39] 
See Tex. Fam. Code Ann. _ 161.001(1)(D), (E) (Vernon 2002).





[40]  See id.
_ 161.001(2).





[41]  For reference purposes above, the
factors set forth and numbered in J.F.C. are as follows:

 

(1) the desires of the child;

 

(2) the emotional and physical
needs of the child now and in the future;

 

(3) the emotional and physical
danger to the child now and in the future;

 

(4) the parental abilities of the
individuals seeking custody;

 

(5) the programs available to
assist these individuals to promote the best interest of the child;

 

(6) the plans for the child by
these individuals or by the agency seeking custody;

 

(7) the stability of the home or
proposed placement;

 

(8) the acts or omissions of the parent
which may indicate that the existing parent-child relationship is not a proper
one; and

 

(9) any excuse for the acts or
omissions of the parent.

 

In the Interest of J.F.C., 96 S.W.3d at 261-62.





[42] 
See id.





[43] 
See id.





[44]  See id.





[45] 
See id.





[46]  See In
the Interest of J.F.C., 96 S.W.3d at 261-62.





[47]
 See id.





[48]  See Tex. Fam. Code Ann. _ 161.001(2) (Vernon 2002); In the Interest of
J.F.C., 96 S.W.3d at 266. 





[49] 
See Tex. Fam. Code Ann. _ 161.001(2) (Vernon 2002).